# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Criminal No. 05-10003-NMG**

UNITED STATES OF AMERICA       .
    Plaintiff       .
                  .

       V.       .
                  .
                  .

JOSEPH YERARDI, Jr.       .
    Defendant       .
                  .

. . . . . . . . . . . . . . .

## TRANSCRIPT OF DETENTION HEARING
### BEFORE THE HONORABLE CHARLES B. SWARTWOOD, III
### UNITED STATES MAGISTRATE JUDGE
### HELD ON APRIL 21, 2005

APPEARANCES:

For the government:  Fred M. Wyshak, Jr., Michael Tabak, Esquire, U.S. Attorney's Office, 1 Courthouse Way, Ste. 9200, Boston, MA  02210; (617) 748-3201.


For the defendant:  Francis J. DiMento, Esquire, DiMento & Sullivan, Seven Faneuil Hall Marketplace, Boston, MA 02109, 617-523-2345.


Court Reporter:




Proceedings recorded by digital sound recording, transcript produced by transcription service.

---

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Government's:** | | | | |
| Pasquale Russolillo | 15 | 44 | 49 | 51 |

| EXHIBITS | DESCRIPTION | IDENT. | IN EVIDENCE |
|---|---|---|---|
| **Government's:** | | | |
| A | Report | 13 | -- |
| B | Report | 13 | -- |
| 1 | Complaint/Affidavit | | 17 |
| 2 | PSR | | 26 |
| 3 | Documents found during search | | 23 |
| 4 | Tape Recording Transcript | | 26 |
| 5 | Documents found during search-2003 | | 28 |
| 6 | Documents found during search-2002 | | 34 |
| 7 | Copies of Postal Money Orders | | 37 |

1                    P R O C E E D I N G S

2         (Court called into session)

3              THE CLERK:  The Honorable Charles B. Swartwood, III

4   presiding.  Today's date is April 21, 2005 in the case of

5   U.S.A. v. Joseph Yerardi, Criminal Action No. 05-10003-NMG.

6   Counsel, please identify yourself for the record.

7              THE COURT:  Start with the government.

8              MR. WYSHAK:  Fred Wyshak and Michael Tabak for the

9   United States.  Good morning, your Honor.

10             THE COURT:  Good morning.

11             MR. DIMENTO:  Francis DiMento for the defendant, your

12   Honor.

13             THE COURT:  And good morning Mr. DiMento.

14             MR. DIMENTO:  Good morning.

15             THE COURT:  Good morning Mr. Yerardi.

16             THE DEFENDANT:  Good morning, your Honor.

17             THE COURT:  All right, we're here – no, everybody be

18   seated.  We're here for two things.  First, Mr. Yerardi's

19   arraignment and then second, a hearing on the government's

20   motion for detention.

21             Mr. Wyshak, before we go any further--

22   (Pause)

23             THE COURT:  -- the remaining defendants in this case

24   are going to be arraigned I think this afternoon, correct?

25             MR. WYSHAK:  Correct, your Honor.

4

1        THE COURT:  At 3:30.

2        MR. WYSHAK:  Right.

3        THE COURT:  I've gone through, we've gone through

4   this indictment and, unfortunately, the summary that you have

5   provided that's normally in the end of these does not

6   adequately set forth the charges against or the offenses

7   against each of these defendants--

8        MR. WYSHAK:  Is that--

9        THE COURT:  -- in that aiding and abetting is one of

10  the offenses but it's not listed.

11       MR. WYSHAK:  Oh, okay.

12       THE COURT:  And it is very confusing.

13       MR. WYSHAK:  Uh-huh.

14       THE COURT:  So by this afternoon, we're all set with

15  Mr. Yerardi, by this afternoon though could you give us another

16  summary for each of the defendants?

17       MR. WYSHAK:  Including the aiding and abetting?

18       THE COURT:  Yeah, that's what--

19       MR. WYSHAK:  Okay.

20       THE COURT:  -- I want.

21       MR. WYSHAK:  Okay.

22       THE COURT:  All right?

23       MR. WYSHAK:  Yes, your Honor.

24       THE COURT:  All right.  Okay, Mr. Yerardi, on your

25  arraignment, a superseding was returned in this court on

5

1   April 7, 2005, and it charges you and others as follow; in

2   Count 1, you're charged with racketeering conspiracy, in

3   violation of 18 U.S.C. Section 1962(d), in Count 2, same

4   offense plus aiding and abetting, in violation of 18 U.S.C.

5   Section 2, in Count 3, illegal gambling business, sports

6   betting, in violation of 18 U.S.C. Section 1955, and aiding and

7   abetting in violation of 18 U.S.C. Section 2.  In Count 6,

8   you're charged with use of wire communication facility or

9   illegal use of a telephone, in violation of 18 U.S.C. Section

10  1084, and aiding and abetting, in violation of 18 U.S.C.

11  Section 2.  In Count 7, same offense, use of wire communication

12  facility internet, in violation of the same statute, 18 Section

13  1084, and aiding and abetting, in violation of 18 U.S.C.

14  Section 2.  In Count 9, money laundering, in violation of 18

15  U.S.C. Section 1956(h), and in Counts 10 through 87 same

16  offense of money laundering plus aiding and abetting in

17  violation of the statute.  In 88 through 85--

18  (Pause)

19          THE COURT:  On Counts 88 through 185, is that money

20  laundering also?

21          MR. WYSHAK:  Yes, your Honor.  I don't know if the

22  Court has the JS-45 here.  I--

23          THE COURT:  Okay.

24          MR. WYSHAK:  It may be--

25          THE COUNT:  Counts, no, wait a minute – 88 through

6

1   185, money laundering, okay, in violation of 18 U.S.C. Section

2   1956 and aiding and abetting.  In Count 333, money laundering,

3   and in Count 333 through 395, money laundering and also aiding

4   and abetting.

5        Now, Mr. Yerardi, there are the offenses of which

6   you've been charged in this indictment.  And, Mr. Wyshak, what

7   are the maximum penalties for these offenses?

8        MR. WYSHAK:  Your Honor, on the racketeering counts,

9   which are Counts 1 and 2, it's a maximum term of incarceration

10  of 20 years, a maximum fine of $250,000 and a maximum term of

11  supervised release of three years.  On all the money laundering

12  counts, the conspiracies and the substantive laundering counts,

13  it's also a maximum term of incarceration of 20 years, and a

14  maximum fine of $250,000, and a maximum term of supervised

15  release of three years.  On the illegal gambling business

16  counts, it's a maximum term of incarceration of five years,

17  maximum fine of $250,000, and a maximum term of supervised

18  release of three years.  On the two counts of 18 U.S.C. 1084,

19  the use of a wire communication facility to transmit wagering

20  information, it's a maximum term of incarceration of two years,

21  a maximum fine of $250,000, and a maximum term of supervised

22  release of one year.

23       THE COURT:  All right.  Now, Mr. Yerardi, you're here

24  of course represented by Mr. DiMento.  If at any time for any

25  reason you want to talk to your lawyer, just raise your hand,

1   I'll stop what we're doing, and I'll give you that

2   opportunity.

3              THE DEFENDANT:  Thank you, your Honor.

4              THE COURT:  And I've already advised you of your

5   right to remain silent.  You understand your right to remain

6   silent?

7              THE DEFENDANT:  I do, your Honor.

8              THE COURT:  All right.  Then would you stand?  Would

9   you state your name?

10             THE DEFENDANT:  Joseph Yerardi, Jr.

11             THE COURT:  And, Mr. Yerardi, have you had an

12  opportunity to review this indictment with Mr. DiMento?

13             THE DEFENDANT:  Yes, I have, your Honor.

14             THE COURT:  Mr. DiMento, is your client then prepared

15  to be arraigned?

16             MR. DIMENTO:  Yes, he is, your Honor.

17             THE COURT:  Would you waive the reading of the

18  indictment?

19             MR. DIMENTO:  We certainly do.

20             THE COURT:  I would hope so. . I'll have my clerk then

21  take your client's plea.

22             THE CLERK:  As to Count 1, charging you in violation

23  of 18:1962, racketeering, conspiracy, what say you, guilty or

24  not guilty?

25             THE DEFENDANT:  Not guilty.

1          THE CLERK:  As to Count 2, charging you in violation

2   of 18:1962, racketeering, and also 18 U.S.C. Section 2, aiding

3   and abetting, what say you, guilty or not guilty?

4          THE DEFENDANT:  Not guilty.

5          THE CLERK:  As to Count 3, charging you in violation

6   of 18 U.S.C. Section 1955, illegal gambling business, sports

7   betting and also 18 U.S.C. Section 2, aiding and abetting, what

8   say you, guilty or not guilty?

9          THE DEFENDANT:  Not guilty.

10          THE CLERK:  As to Count 6, charging you in violation

11   of 18 U.S.C. Section 1084, communication facility, telephone,

12   and also 18 U.S.C. Section 2, aiding and abetting, what say

13   you, guilty or not guilty?

14          THE DEFENDANT:  Not guilty.

15          THE CLERK:  As to Count 7, charging you in violation

16   of 18 U.S.C. Section 1084, use of a wire communication

17   facility, internet, and also 18 U.S.C. Section 2, aiding and

18   abetting, what say you, guilty or not guilty?

19          THE DEFENDANT:  Not guilty.

20          THE CLERK:  As to Count 9, charging you in violation

21   of 18 U.S.C. Section 1956, money laundering, what say you,

22   guilty or not guilty?

23          THE DEFENDANT:  Not guilty.

24          THE CLERK:  As to Counts 10 through 87, charging you

25   in violation of 18 U.S.C. Section 1956, money laundering, and

1   also 18 U.S.C. Section 2, aiding and abetting, what say you,

2   guilty or not guilty?

3          THE DEFENDANT:  Not guilty.

4          THE CLERK:  As to Counts 88 through 185, charging you

5   in violation of 18 U.S.C. Section 1956, money laundering, and

6   also 18 U.S.C Section 2, aiding and abetting, what say you

7   guilty or not guilty?

8          THE DEFENDANT:  Not guilty.

9          THE CLERK:  As to Count 333, charging you in

10  violation of 18 U.S.C. Section 1956, money laundering, what say

11  you, guilty or not guilty?

12         THE DEFENDANT:  Not guilty.

13         THE CLERK:  As to Counts 334 through 395, charging

14  you in violation of 18 U.S.C. Section 1956, and also 18 U.S.C.

15  Section 2, money laundering and aiding and abetting, what say

16  you guilty or not guilty?

17         THE DEFENDANT:  Not guilty.

18         THE CLERK:  Thank you.  You may be seated.

19         THE DEFENDANT:  Thank you.

20         THE CLERK:  Mr. Wyshak, I just noticed, let me have

21  that.  I just noticed that actually you do have 18 Section 2 on

22  these.  I didn't see it before.  It just wasn't written out.

23  In other words it had the one offense but not the second.

24         MR. WYSHAK:  Yes.

25         THE COURT:  I can probably figure that out.

1       MR. WYSHAK: Right. Everything would have – all the

2 substantive counts would have a aiding and abetting count.

3       THE COURT: No, they all don't. That's what I'm

4 trying to tell you.

5       MR. WYSHAK: Well, there are some conspiracy counts

6 in there which--

7       THE COURT: Do not.

8       MR. WYSHAK: -- do not have the aiding and abetting.

9       THE COURT: For example, Count 9 does not contain an

10 aiding and abetting.

11       MR. WYSHAK: Okay. And--

12       THE COURT: So, what I guess, I guess I'm saying is

13 for this afternoon run through those, make sure they're

14 correct, photocopy it, give it to me so that--

15       MR. WYSHAK: All right.

16       THE COURT: -- I can do it. Okay?

17       MR. WYSHAK: Yes, your Honor.

18       THE COURT: All right. Now, Mr. DiMento, this – you

19 can be seated. You don't need to stand. This, as you can see,

20 is a superceding indictment, and I have issued an initial

21 scheduling order in connection with the original case, and as a

22 result of an initial status conference with respect to four of

23 the defendants, Mr. Homsey, Mr. Icaboni, Albertelli, and

24 Gianelli, we continued the case to a status conference on June

25 21, 2005 here in this courtroom at 2:00. And the reason for

1   that is the voluminous discovery involved in this case, and

2   before anyone files any motions, I want each defense counsel to

3   have an opportunity to have reviewed the evidence produced by

4   the government to them as part of their automatic disclosure

5   and also have had an opportunity to view that or review that

6   evidence with their client.  And so, therefore, the case is

7   continued for a status conference to June 21.  Here's a copy of

8   the status report, and I'll give it to you.

9           MR. DIMENTO:   Thank you.

10          THE COURT:   All right, next order of business is the

11  government's motion for detention.  Mr. DiMento, you weren't

12  here, but the government moved for detention on the grounds of

13  (f)(1)(D), dangerousness, (f)(2)(A), risk of flight.  Is that

14  correct, Mr. Wyshak?

15          MR. WYSHAK:   Yes, and I also if I didn't - it should

16  be (f)(2)(B) as well.

17          THE COURT:   (2)(B)?

18          MR. WYSHAK:   (2)(B).

19          THE COURT:   All right.

20          MR. WYSHAK:   Obstruction.  Your Honor, before we

21  begin the hearing, there is a matter that - it's a discovery

22  issue.  There are two reports created by this trooper regarding

23  a particular witness that for certain reasons regarding witness

24  security we would prefer not to have to disclose at this

25  juncture, and I would like to be able to discuss that matter

12

1  with you - (inaudible - #11:41:40).  I have copies of those

2  reports here.

3          THE COURT:  Okay, now wait a minute.  Hang on.  Have

4  you - the trooper has prepared two reports?

5          MR. WYSHAK:  Well--

6          THE COURT:  Well, yeah a whole bunch of reports--

7          MR. WYSHAK:  Right.

8          THE COURT:  -- but there are two in particular,

9  right--

10          MR. WYSHAK:  Yes.

11          THE COURT:  -- having to do with a particular

12  witness?

13          MR. WYSHAK:  Correct, your Honor.

14          THE COURT:  All right.  And you have not produced

15  those to Mr. DiMento?

16          MR. WYSHAK:  Not yet.  Right.

17          THE COURT:  All right.  And your reason for not

18  producing it is safety of the witness?

19          MR. WYSHAK:  Yes, and other reasons that I'd rather

20  not disclose in open court.

21          THE COURT:  Well--

22          MR. WYSHAK:  I'd be happy to give them to the Court--

23          THE COURT:  Right.

24          MR. WYSHAK:  -- to review to make sure they contain

25  no exculpatory information or--

1     THE COURT:  He's not going to testify to any of

2  this?

3     MR. WYSHAK:  No, your Honor.  No.  It wouldn't be

4  part of his direct examination.

5     THE COURT:  Well, okay, look, I don't want to delay

6  anything, so what we're going to do is this.  We'll have an in

7  camera review of these reports to determine whether or not

8  they're going to be produced.  And if there's - I'll have to

9  continue the detention hearing at the end if there's any, if

10 there's a real issue.  Mr. DiMento doesn't even know what

11 you're talking about nor do I, so I can't tell and he can't

12 tell.

13     MR. WYSHAK:  Okay.

14     THE COURT:  All right, we'll - I'm not going to make

15 a decision right at this moment.  If you have those reports,

16 hand them up.  We'll mark them for identification, and we'll -

17 just, we'll do it this way, Government's A for identification.

18     THE CLERK:  Both of them A?

19     THE COURT:  No, and B.

20    (Government Exhibits A and B, marked for identification)

21 (Pause)

22     THE COURT:  You just give him all that stuff?

23     MR. WYSHAK:  Well, it's, really, your Honor, it's

24 just transcripts of, complete transcripts.  We put certain

25 excerpts of the transcripts in the trooper's affidavit.  I

1  wanted to provide the complete version of the transcript to

2  Mr. DiMento.

3          THE COURT:  All right.  Now, Mr. DiMento,--

4          MR. DIMENTO:  Yes?

5          THE COURT:  -- on this business with respect to these

6  two reports, I have them here.  I've marked them Government's A

7  for identification, B for identification.  Now, with respect to

8  those, do you have any, are there other than the fact you may

9  object to this whole business, but do you have any suggestions

10 as to how this should be done other than what I have suggested?

11         MR. DIMENTO:  Well, what mystifies me, your Honor, is

12 this.  Do the allegations under 2(b) rest on those reports and

13 nothing else?  If they do then I must see the reports.

14         THE COURT:  Well, there's no question.

15         MR. DIMENTO:  Or 2(b) has to be taken out of here.

16         THE COURT:  Okay.

17         MR. WYSHAK:  No, no, the allegations under 2(b), your

18 Honor, basically rest on the fact that Mr. Yerardi has in the

19 past been convicted of witness tampering and obstruction of

20 justice.

21         THE COURT:  All right.  No.  Here look, here's how

22 we're starting out, this is the rule, it's very simple, if you

23 haven't seen it, they're not going to talk about it, that's

24 number one.

25         MR. DIMENTO:  Okay.

15

1        THE COURT:  Number two, I'm going to look at it to

2   see whether or not you can see it.

3        MR. DIMENTO:  Right.

4        THE COURT:  And that's what I'm going to do unless

5   you have some other suggestion.

6        MR. DIMENTO:  Well, I mean, obviously I'm left with

7   the uncomfortable feeling that the fact finder knows something

8   that I don't know.

9        THE COURT:  Yeah.  Well, let me tell you something,

10  I'm 67 years old.  I can look at something and I can ignore it.

11  I've been in this business a long time.  It's not going to

12  influence me one way or the other.  That's the best I can do

13  for you.

14        MR. DIMENTO:  Okay.

15        THE COURT:  All right?

16        MR. DIMENTO:  I thank you--

17        THE COURT:  All right, let's go.

18        MR. WYSHAK:  Now, your Honor, at this time the

19  government calls Trooper Pasquale Russolillo.

20     (Government witness, Pasquale Russolillo, sworn)

21        THE CLERK:  Please be seated.  Could you state your

22  name and spell your last name for the record.

23        THE WITNESS:  It's Pasquale Russolillo, the last name

24  is R-U-S-S-O-L-I-L-L-O.

25        MR. WYSHAK:  Thank you, your Honor.

Direct - Russolillo

16

DIRECT EXAMINATION

BY MR. WYSHAK:

Q   Showing you what's in front of you, Trooper Russolillo, what is that?

A   It's an affidavit that I prepared in support of the pretrial detention of Joseph Yerardi, Jr.

Q   Okay.  And have you sworn to the truth of that affidavit?

A   Yes, I have.

        MR. WYSHAK:  Okay, I'd ask that the affidavit be marked Exhibit 1, your Honor.

        THE COURT:  All right, now, Mr. DiMento, did you get a copy of the affidavit?

        MR. DIMENTO:  Yes, I did, this morning.

        THE COURT:  And did you have a chance to read it?

        MR. DIMENTO:  No, that's the truth, I haven't.

        THE COURT:  He's got to have a chance to read it.

        MR. WYSHAK:  Your Honor, I apologize for the tardy service.

        THE COURT:  I mean, I last saw Mr. Yerardi Friday. It's now Thursday.

        MR. WYSHAK:  That's correct, your Honor.  I'm not making excuses, but Mr. Tabak had a death in his family--

        THE COURT:  Okay, well, I'm sorry about that.

        MR. WYSHAK:  -- and has been out of the jurisdiction, and unfortunately I was--

1       THE COURT:  How many pages is this affidavit?

2       MR. DIMENTO:  Well, without the exhibits, it's 19.

3       MR. WYSHAK:  Much of it which recites past history,

4    your Honor,--

5       THE COURT:  Well, that's all right.

6       MR. WYSHAK:  -- and the rest of which I intend to

7    elicit pretty much from the witness and the direct testimony.

8       MR. DIMENTO:  If this has only to do with the merits

9    of the case, I don't think I have much objection, your Honor.

10   If we just get from the trooper the skeletal facts on--

11      THE COURT:  Well, look here's - I'm going to mark it

12   Government 1.  Well, no, no - do you object to it?

13      MR. DIMENTO:  Do I object?  No, I don't.

14      THE COURT:  Government Exhibit 1.

15      (Government's Exhibit No. 1, admitted)

16      MR. DIMENTO:  Yep.  Let's do it that way.

17   (Pause)

18      THE COURT:  By the way, has Mr. Yerardi been

19   interviewed?

20      THE CLERK:  He has not, your Honor.

21      THE COURT:  Okay.

22      MR. WYSHAK:  Your Honor, and rather than recite

23   through the witness some of the past events involving

24   Mr. Yerardi, I would ask that the Court take judicial notice of

25   the fact that Mr. Yerardi was indicted in approximately October

1  1993, was a fugitive from approximately October of 1993

2  through approximately May of 1994, that he was released on

3  conditions shortly after his arrest in May of 1994, that those

4  conditions of release were revoked in January of 1995.

5  Actually, we've attached a copy of the Court's report and

6  recommendation which was issued after a detention hearing.  The

7  date of the report is March 24, 1995, and that's attached as

8  Exhibit B to Trooper Russolillo's affidavit that this Court

9  held Mr. Yerardi in contempt for violating the Court's original

10 release order, and that in August of 1995, Mr. Yerardi pled

11 guilty to racketeering and loan sharking, gambling, extortion

12 type violations and was sentenced to approximately 10 or 11

13 years in prison.  Those are--

14         THE COURT:  Are they the attachments to that

15 affidavit?

16         MR. WYSHAK:  The Court's recommendation is, his

17 criminal record is attached.  The rest of the history is

18 recanted in the affidavit.

19         THE COURRT:  All right.

20         MR. WYSHAK:  We also propose to submit as an exhibit

21 the PSR.  We didn't want to make it part of the public record,

22 but--

23         THE COURT:  Do you have a copy for Mr. DiMento?

24         MR. WYSHAK:  Yeah, we'll get a copy.

25         MR. DIMENTO:  By the way may I say the order, Exhibit

Direct - Russolillo                                    19

 1    B, has only the odd numbered pages.  This was apparently a

 2    two-sided original document in which only one side was copied.

 3             THE COURT:  Hmmm.

 4             MR. WYSHAK:  Well, I'll fix that, your Honor.  I am

 5    sorry.

 6             THE COURT:  Well, let's take a look at the exhibit.

 7    Does the exhibit have the--

 8    (Pause)

 9             THE COURT:  Trooper, take a look at that--

10             THE WITNESS:  Sure.

11             THE COURT:  -- affidavit of yours.

12             THE WITNESS:  Uh-huh.

13             THE COURT:  And it refers to an exhibit.

14             THE WITNESS:  There's two exhibits, A and B.

15             THE COURT:  Okay.  What's A?

16             THE WITNESS:  A is his BOP, his criminal history.

17             THE COURT:  Okay.  What's B?

18             THE WITNESS:  And B is a report and recommendation.

19             THE COURT:  All right.  Now don't - it's got page

20    one?

21             THE WITNESS:  It has a page one, it's front and back,

22    two and three, and goes all the way--

23             THE COURT:  Okay.

24             THE WITNESS:  -- to page 31 with your signature on

25    it.

1          THE COURT:  All right.

2          MR. WYSHAK:  I don't think that we did correct that

3   mistake, and now Mr. DiMento has a complete corrected copy.

4          THE COURT:  All right.  Do you have a copy of this

5   now?

6          MR. DIMENTO:  Yes, I do.  Yes, your Honor, I do.

7          THE COURT:  All right.

8          MR. DIMENTO:  Thank you.

9          THE COURT:  Now, what about the pretrial report.  Do

10  you have that?

11         MR. WYSHAK:  Yes, we're getting copies of that for

12  Mr. DiMento, your Honor.  And we just want to make that - it's

13  part of the court record anyway.

14         THE COURT:  I understand that.

15         MR. WYSHAK:  So rather than elicit information from

16  the PSR in open court which is not generally a public record--

17         THE COURT:  Correct.

18         MR. WYSHAK:  -- we're just going to ask that the

19  Court take notice of the information contained in the PSR.

20         THE COURT:  Okay.  That's fine.

21         MR. WYSHAK:  And we will get--

22         THE COURT:  Mr. DiMento, any problem with that--

23         MR. DIMENTO:  No.

24         THE COURT:  -- other than the fact you get a copy of

25  it, right?

1          MR. DIMENTO:  Right.

2          THE COURT:  Okay.  So the PSR for the record is

3   Government's Exhibit 2.  All right.

4          (Government's Exhibit No. 2, admitted)

5          MR. WYSHAK:  All right, may I proceed?

6          THE COURT:  Yes, of course.

7          MR. WYSHAK:  Okay.

8   BY MR. WYSHAK:

9   Q    Trooper Russolillo, it's fair to say that you conducted an

10  investigation that commenced some time in mid-2003; is that

11  fair to say?

12  A    That's correct.

13  Q    And that investigation concerned an individual named

14  Arthur Gianelli?

15  A    That's correct.

16  Q    And that investigation has led to the indictment in this

17  case; is that correct?

18  A    That's correct.

19  Q    All right.  Now, at some point in time during the course

20  of your investigation, did you learn that the defendant in this

21  case was participating in illegal activities with Mr. Gianelli?

22  A    That's correct.

23  Q    And how did you initially learn that?

24  A    It was through the wiretap investigation.

25  Q    Okay.  And what, if anything, did you learn about

1   Mr. Yerardi's participation?

2   A    That he, that he was responsible for handling certain

3   customers that were related to his gambling organization as

4   well as Arthur Gianelli with Dennis Albertelli.

5   Q    Did you also learn that money, which was the proceeds of

6   this investigation was being distributed to Mr. Yerardi and

7   other – the proceeds of this illegal activity was being

8   distributed to Mr. Yerardi and other members of his family?

9   A    Yes.

10  Q    And were there discussions on the wiretaps regarding that?

11  A    Yes, there were.

12  Q    Okay.  As a result of the wiretap investigation, did there

13  come a time when you executed search warrants in this case?

14  A    Yes.

15  Q    And approximately when was that?

16  A    It was March of 2004.

17  Q    Okay.  Showing you this document, can you tell us what

18  that is?

19  A    This is a document with numerous notations of figures

20  related to money, and this was found during the search at

21  Dennis Albertelli's house.

22  Q    Okay.

23          MR. WYSHAK:  Now, I'm going to move that that

24  document be marked Exhibit 3, your Honor.  It's actually

25  collectively several pages; is that right?

Direct - Russolillo                                                          23

1              THE COURT:  All right, but is there any mention on

2    that document of this defendant?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  Any objection, Mr. DiMento?

5              MR. DIMENTO:  No, your Honor.  Are we talking about

6    this two-page document?

7              THE WITNESS:  It's actually, well, it's four, back

8    and front.

9              MR. DIMENTO:  Oh, I'm sorry.  Okay, no objection.

10             THE COURT:  You got the back and the front this time?

11             MR. DIMENTO:  Yes, I do.  Thank you.

12             THE COURT:  All right.  That's number 3.

13             MR. WYSHAK:  Here's a copy for the Court to follow

14   along.

15             THE CLERK:  Do you want me to mark this one?

16             THE COURT:  Yeah.

17             MR. WYSHAK:  No, no, no--

18             THE COURT:  She's going to mark that one.

19        (Government's Exhibit No. 3, admitted)

20   (Pause)

21   BY MR. WYSHAK:

22   Q    Okay, showing you what's been marked Exhibit 3, Trooper

23   Russolillo, do you notice any references on that document to

24   Mr. Yerardi?

25   A    Yes, I do.

1  Q    And what do you notice?

2  A    On the left hand corner with a date of 4/15, you have

3  initials JY, which I believe to be Joe Yerardi, R being his

4  red, JY being Joe Yerardi, C being cash.

5  Q    Okay.  And what does red mean?

6  A    Red is his make up figure before he starts making money.

7  He handles several agents that he's responsible for and before

8  he starts making money.  The way he's going to make money is

9  that he has to start winning.  When he starts losing, there's a

10 percentage that goes under the red.

11 Q    Okay.  So essentially if his customers or the agents who

12 work for him, if the customers win, he loses, he goes into the

13 red.  He doesn't start making money until his customers lose

14 and the office starts making money so to speak?

15 A    That's correct.

16 Q    And looking at that red column, are there times when in

17 fact the number is a zero?

18 A    Several times.

19 Q    Okay.  And so that number adjusts over a period of time,

20 correct?

21 A    That's correct.

22 Q    And what would the zero indicate to you?

23 A    Well, he's made up what is red and now any other money,

24 he'll start making money.  It'll go into his pocket.

25 Q    Start earning commissions?

Direct - Russolillo                    25

1    A    Correct.

2    Q    And can you, looking at all four pages tell us what time

3    period is covered by those columns?

4    A    Yes.  I looked up on the calendar, on 4/15 it'll be the

5    week ending, that's 2001, and it goes all the way up to if you

6    go to the fourth page, I believe 6/24 will be 2003.

7    Q    And are there weekly entries?

8    A    Yes, there are.

9    Q    Are those weekly entries?

10   A    Yes, they are.

11   Q    So it's approximately two years of weekly entries?

12   A    That's correct.

13   Q    All right.  Now, if you go to the next column, you said

14   that you thought C meant cash?

15   A    That's correct.

16   Q    And what is that based upon?

17   A    That's based on - that figure's based upon several things,

18   one, the expenses that Mr. Yerardi incurred during this

19   timeframe along with his commission.

20   Q    Okay.  And what is the beginning number under the cash?

21   A    On 4/15, your Honor, it starts off $127,570.

22   Q    Okay, and it's fair to say that that number changes over

23   the period of years; is that correct?

24   A    That's correct.

25   Q    Sometimes it gets larger?

Direct - Russolillo                                                    26

1   A     That's correct.  Just for example, on 12/9 it goes all

2   the way up to 161,496.

3   Q     Okay.  And sometimes it gets smaller; is that right?

4   A     Yes.  And I have a low number here of 91,910.

5   Q     Okay.  And based upon the wiretap investigation, did you

6   learn that some of the adjustments to that cash figure were

7   based upon money sent to Mr. Yerardi in prison as well as to

8   other members of his family?

9   A     That's correct.

10  Q     Okay.

11        MR. WYSHAK:  As a matter, your Honor, at this time

12  I'd like to mark this transcript that's dated November 24, 2003

13  as the next exhibit.

14        THE COURT:  I'm sorry, November 24, 2003?

15        MR. WYSHAK:  Yeah.

16        THE COURT:  And that's a transcript of a wire

17  intercept?

18        MR. WYSHAK:  Yes.

19        (Government's Exhibit No. 4, admitted)

20  (Pause)

21        MR. WYSHAK:  All right, your Honor, the record should

22  reflect that we did give Mr. DiMento a copy of the PSR, and

23  I'll hand a copy--

24        THE COURT:  Okay.

25        MR. WYSHAK:  -- to the clerk to give your Honor.

Direct - Russolillo                                27

1              THE CLERK:  This is number two?

2              THE COURT:  Two.

3              MR. WYSHAK:  Yeah, it's number two.

4              THE COURT:  Two.

5              MR. WYSHAK:  Okay.  Your Honor, at this time I'd like

6    to play a portion, a very small portion of this tape.

7              THE COURT:  Go ahead.

8    (Pause)

9              THE COURT:  Hang on.  Let me have the transcript--

10             MR. WYSHAK:  Okay.

11             THE COURT:  -- so I can follow it.  She's got it

12   right there.

13             MR. WYSHAK:  Again, before I play the tape, your

14   Honor, I would also like to introduce the next exhibit.

15   BY MR. WYSHAK:

16   Q    I'm showing you one of this group of documents marked

17   calendar week ending January 5th.  Do you recognize those

18   documents?

19   A    Yes.

20   Q    And what do you recognize those documents to be?

21   A    First of all, this was found also during the search of

22   Dennis Albertelli's house, and this is documents with notations

23   regarding expenses that were incurred to operate this gaming

24   business, especially regarding Joseph Yerardi.  And the week

25   ending is January 5th, which I looked up to be January 5th, a

Direct - Russolillo                              28

1    Sunday, 2003.

2    Q    Okay.  And those were, came from Mr. Albertelli's house;

3    is that correct?

4    A    That's correct.

5    Q    Okay.

6              MR. WYSHAK:  Your Honor, may we mark this - this

7    would be--

8              THE COURT:  Well, if it's - any objection--

9              MR. DIMENTO:  No, your Honor.

10             THE COURT:  -- Mr. DiMento?

11             MR. DIMENTO:  No, your Honor.

12             THE COURT:  Okay.  Five.

13        (Government's Exhibit No. 5, admitted)

14   BY MR. WYSHAK:

15   Q    Okay.  I'm showing you now what's been marked Exhibit 5.

16   I'd like to direct your attention to - your Honor, at this time

17   I'm going to put one of the pages of Exhibit 5 up on the

18   projector, and this would be the page marked calendar week

19   ending November 2nd.  See that?

20   A    That's correct, sir.

21   Q    Okay.  And directing your attention over here to the left

22   hand column, do you see a notation JY?

23   A    Yes, the same notation that was on one of the exhibits

24   that I just testified to.

25   Q    All right, and then it says 358, and it says Herald,

Direct - Russolillo                          29

1    correct?

2    A    That's correct.

3    Q    And there are two notations under that that say Rafia?

4    A    Correct.

5    Q    Do you know who Rafia is or what that's an indication of?

6    A    Yes, that's the wife of Joseph Yerardi.

7    Q    And her name is Rafia Feghi?

8    A    That's correct.

9    Q    And the notation, Alyssa, do you see that?

10   A    Yes.

11   Q    And do you know what that's a notation?

12   A    Yes, I believe that is the daughter of Joseph Yerardi.

13   Q    Okay.  And then at the bottom, those two notations,

14   McKeen, do you know what that's an indication of?

15   A    Yes, those are umm, two orders, postal money orders that

16   were sent over to the prison that Mr. Yerardi's being housed

17   at.

18   Q    Okay.  Now directing your--

19        THE COURT:  Wait a minute, wait, wait, wait - McKeen?

20        THE WITNESS:  Correct.

21   BY MR. WYSHAK:

22   Q    Yeah what is McKeen?

23   A    I believe it's a federal prison.

24        THE COURT:  Oh okay.

25   BY MR. WYSHAK:

Direct - Russolillo                                                    30

1    Q    A federal correction institute in Pennsylvania--

2    A    That's correct.

3    Q    -- is that right?  Okay.  Now, directing your attention

4    back to the, this recording that's been marked as - is it

5    Exhibit 4--

6              THE COURT:  It's four.

7    BY MR. WYSHAK:

8    Q    Exhibit 4, you've reviewed the transcript of this

9    recording?

10   A    That's correct.

11   Q    Okay.  And does part of the transcript of this recording

12   relate to the notations on Exhibit 5?

13   A    That's correct.

14   Q    Okay.

15             MR. WYSHAK:  At this time I'm going to ask that I be

16   permitted to play just a portion of this recording, your Honor?

17             THE COURT:  So where are you starting?

18             MR. WYSHAK:  Pretty much from the beginning.

19             THE COURT:  All right.

20             MR. WYSHAK:  The relevant portion is at the

21   beginning.

22             THE COURT:  All right.

23   (Tape played for Court)

24   BY MR. WYSHAK:

25   Q    All right.  Is it fair to say, Trooper Russolillo, that

Direct - Russolillo                                      31

1   the conversation that we just listened to relates to the

2   notations on the sheets which are part of Government Exhibit 5

3   which are week ending November 2nd and the 9th and the 16th?

4   A    That's correct, sir.

5   Q    Okay.  And, again, going to the week ending the 16th, you

6   told us about Alyssa and Rafia.  What is that B-H-S, do you

7   know what that's--

8   A    Yes.

9   Q    -- a reference to?

10  A    That's one of Mr. Yerardi's children attends that school,

11  that'll be Belmont Hill, I believe it is.

12  Q    Okay.  And is Mr. Gianelli paying the tuition at Belmont

13  Hill?

14  A    Yes, through Salvatore Ramanchi.

15  Q    Okay.  He's one of the other defendants in this case?

16  A    That's correct.

17  Q    So essentially if you compare what's been marked

18  Government Exhibit 5 with what was I think marked Government

19  Exhibit 3, the expenses incurred by Mr. Yerardi and his family

20  are taken off the cash calculation; is that correct?

21  A    That's correct.

22  Q    Now, just a few more questions about this recording we

23  just listened to.  This individual - do you have the

24  transcript?

25  A    No, I don't, sir.

Direct - Russolillo                                                  32

1    Q     All right.  Showing you, it looks like the third page of

2    the transcript, essentially there's a notation to you add

3    Sonny, 24 dimes - in the middle of the page?

4    A     Yes, sir.

5    Q     And which you got to take half off for him, right, and

6    they're talking about adjustments for Joey; is that correct?

7    A     That's correct.

8    Q     What do you understand that to mean?

9    A     That, I believe to mean that Sonny is Tony Daniels who is

10   responsible for setting up the website called Duke Sports and

11   that 24,000 is going to be money that's got to be paid to Sonny

12   and return is being sent down to the principal owners of Duke

13   Sports.

14   Q     Okay.  So essentially it costs them, at least during that

15   time period, $24,000 a month that they had to pay to this

16   off-shore gambling site that they were using--

17   A     That's correct.

18   Q     -- is that correct?

19   A     And that price would fluctuate with the number of

20   customers that are betting with the website.

21   Q     And according to that conversation, half of the costs of

22   the website is charged against Mr. Yerardi, correct?

23   A     That's correct.

24   Q     Is that right?

25   A     That's correct.

Direct - Russolillo                                    33

1    Q    Now, let me see that again.  There's also a reference on

2    the next page to Salvi's sheet.  What is that a reference to?

3    A    Salvi is Salvatore Lefty Ramanchi.

4    Q    Okay.  So the sheets that are introduced as government

5    Exhibit 5 were prepared by Mr. Ramanchi; is that correct?

6    A    We believe so, correct.

7    Q    All right.  And that's what the reference is to that?

8    A    That's correct.

9    (Pause)

10            MR. WYSHAK:  All right.  Your Honor, at this time I'd

11   like to show the witness the next exhibit.

12   BY MR. WYSHAK:

13   Q    And essentially I'm showing you again an exhibit that

14   we've marked collectively for identification at this point in

15   time, Exhibit 6.  What is that?

16   A    This is umm, very similar to the documents that were just

17   presented several minutes ago.  This is several notations with

18   figures.  This is an expense which incurs by the gaming

19   industry run by Gianelli and Mr. Yerardi as well as his

20   expenses.

21   Q    Okay.  So basically those are similar to what's up on the

22   projector there except that's for a different time period; is

23   that correct?

24   A    Correct.  This would be for the year 2002.

25   Q    Okay.  So Exhibit 5 is 2003 and those are 2002?

Direct - Russolillo                                      34

1    A    That's correct.

2    Q    And those are also obtained pursuant to the execution of a

3    search warrant at Mr. Albertelli's house?

4    A    That's correct.

5    Q    Is that correct?

6              MR. WYSHAK:  I offer them as Government Exhibit 6.

7              THE COURT:  Any objection Mr. DiMento?

8              MR. DIMENTO:  I don't think so.  I just want to be

9    sure we're talking about the same thing--

10             THE COURRT:  Yep.

11             MR. DIMENTO:  -- Fred, please?  Is this it?

12             MR. WYSHAK:  Yes.

13             MR. DIMENTO:  Thank you.

14             THE COURT:  Okay, that's admitted as Government

15   Exhibit 6.

16        (Government's Exhibit No. 6, admitted)

17   BY MR. WYSHAK:

18   Q    Okay.  Now directing your attention to the next group of

19   documents in front of you, which we can, being marked

20   Government Exhibit 7 for identification at this point in time.

21   Can you identify what those documents are?

22   A    Yes, these are copies of postal money orders that were

23   sent to Mr. Yerardi.

24   Q    Okay.  Now those were not seized at Mr. Albertelli's

25   house; is that correct?

Direct - Russolillo                                35

1    A    That's correct.

2    Q    Were any documents related to those money orders seized at

3    the time the search warrants were executed?

4    A    Yes.  There was numerous envelopes with a receipt from a

5    postal money order and then from there special agent from the

6    IRS, Sandra Lamansky, took it a step further and got these

7    documents here.

8    Q    So basically when you purchase a money order you get a

9    stub?

10   A    That's correct.

11   Q    And the person who buys it, keeps the stub and sends the

12   money order to wherever they want to send the money to,

13   correct?

14   A    That's correct?

15   Q    And those stubs were found at Mr. Albertelli's house?

16   A    That's correct.

17   Q    And subpoenas were issued for the actual money orders--

18   A    That's correct.

19   Q    -- based upon the stubs?

20   A    That's correct.

21   Q    And those are copies of those money orders?

22   A    Yes, yes, they are.

23   Q    Now, and these money orders are consistent with the

24   references on what's been marked Government Exhibit 5 and 6

25   regarding payments to McKeen and other institutions; is that

Direct - Russolillo                                                36

1    correct?

2    A    That's correct.

3    Q    In addition to postal money orders being made out to

4    Mr. Yerardi directly, were there postal money orders made out

5    to other inmates at those institutions?

6    A    Yes.

7    Q    And do you have an understanding of what those postal

8    money orders were?

9    A    It was learned that these money orders were sent there to

10   these other prisoners with the, from the direction of

11   Mr. Yerardi and Arthur Gianelli.

12   Q    Okay.  And you learned that as a result of your

13   investigation?

14   A    That's correct.

15   Q    All right.  Now directing you to your--

16             THE COURT:  Now, on seven--

17             MR. WYSHAK:  I'm sorry.

18             THE COURT:  -- what period of time do they cover do

19   you know?

20             THE WITNESS:  I have one in front of me here, your

21   Honor.  It's 2000 - one of them is 2002, 2003.  So it goes from

22   2002 up until 12/17/2003.

23             MR. WYSHAK:  I think they were arranged

24   chronologically.

25             THE COURT:  All right.

Direct - Russolillo

37

1       THE WITNESS:  They are.

2       THE COURT:  All right what do you want to do--

3       MR. WYSHAK:  Okay I--

4       THE COURT:  -- offer them - any, Mr. DiMento any--

5       MR. DIMENTO:  No, there's no objection.

6       THE COURT:  All right.  They're admitted.

7       (Government's Exhibit No. 7, admitted)

8    BY MR. WYSHAK:

9    Q    All right.  Now, I'd like to direct your attention back to

10   your affidavit.  And direct your attention to page six.

11   A    Yes, sir.

12   Q    Okay.  And you make reference to prison tape recordings.

13   What are prison tape recordings?

14   A    They're recordings of inmates that are being held at

15   whatever institution that they're in.

16   Q    Okay.  An inmate makes a call out of an institution, it's

17   recorded; is that fair to say?

18   A    That's correct.

19   Q    And as a result of this investigation were some recordings

20   obtained regarding Mr. Yerardi's conversations?

21   A    That's correct.

22   Q    And that was for a certain time period in late 2003 to

23   early 2004; is that correct?

24   A    That's correct.

25   Q    Now, directing your attention to the first conversation

1    that you discuss in your affidavit.  It's a conversation

2    between Mr. Yerardi and Mr. Daniels; is that correct?

3    A    That's correct.  Mr. Daniels is also known as Sonny.

4    Q    Okay.  And there's a reference right at the beginning of

5    this conversation to Horizon.  Do you have an understanding of

6    what Horizon is?

7    A    Yes.

8    Q    What is Horizon?

9    A    It's a website for gambling on the internet.

10   Q    Okay.  And is that a website that's associated with an

11   individual named Todd Westermin?

12   A    Yes, it is.

13   Q    And is that one of the defendants in this case?

14   A    Yes, it is.

15   Q    And was in fact this individual, Todd Westermin, the

16   individual who ultimately set up the website known as

17   DukeSportsWeb.com for a Mr. Gianelli and Mr. Yerardi?

18   A    That's correct.

19   Q    So basically there's a conversation between Mr. Daniels

20   and Mr. Yerardi about Horizon?  And--

21   A    That's correct.

22   Q    -- Mr. Yerardi is quizzing Mr. Daniels as to whether or

23   not Mr. Daniels talked to this individual; is that correct?

24   A    That's correct.

25   Q    All right.  Now directing your attention to the next

Direct - Russolillo                                                39

1    conversation on the next page, this is a conversation between

2    Mr. Yerardi and Mr. Gianelli?

3    A    Correct.

4    Q    Right?  And, again, this is a conversation about using the

5    internet for gambling?

6    A    Correct.

7    Q    And a reference to the website that's up, Mr. Yerardi says

8    24/7?

9    A    Correct.

10   Q    Right?  And why is that important that the site is up

11   24/7?  What does that mean?

12   A    It gives you access to gamble 24 hours a day, seven days a

13   week.

14   Q    Okay.  So, traditionally, if a bookmaker was going to run

15   a gambling office, is that a gambling office that operates 24

16   hours a day, seven days a week?

17   A    Not a typical bookmaking office, no.

18   Q    Right.  What are the typical hours for a bookmaking

19   office?

20   A    The prime gaming hours are weekends of course would be

21   from about 11:30 in the morning to 3:30 in the afternoon.  And

22   if there's afternoon games, it takes it from there to up until

23   7:30 at night.  And during the week it's typically from 6:15 to

24   probably quarter of eight.

25   Q    Okay.  So it's a very short window to place bets--

Direct - Russolillo                                    40

1    A      Correct.

2    Q      -- is that right?  Advantage of the website is it's up all

3    the time?

4    A      Correct.

5    Q      Okay.  And again the next conversation on page seven is

6    again a conversation between Mr. Yerardi and Mr. Daniels

7    regarding the capabilities of the software on the website; is

8    that fair to say?

9    A      That's correct.

10   Q      All right.  Now, again turning your attention to page nine

11   of your affidavit, you make reference to a recorded

12   conversation between Mr. Gianelli and Mr. Yerardi.  What is

13   that a conversation about?

14   A      It's about Mr. Yerardi asking Mr. Gianelli sending money

15   over to Belmont Hill where one of Mr. Yerardi's children

16   attends.

17   Q      Okay.  And that's the BHS that we see up there on exhibit

18   five?

19   A      That's correct.

20   Q      Then again on the next page there's another conversation,

21   which you talk about, and what is that conversation about?

22   A      It's the same thing.  It's Mr. Yerardi talking about

23   sending over 2650 for Joey's Belmont Hill school tuition.

24   Q      Okay.  And further down the page--

25          THE COURT:  I'm sorry, what page is that?

Direct - Russolillo                                        41

1          MR. WYSHAK:  I'm sorry this is page--

2          THE WITNESS:  10.

3          MR. WYSHAK:  -- 10 of the affidavit.

4    BY MR. WYSHAK:

5    Q    Further down the page there's a conversation about sending

6    money for Mr. Yerardi's commissary?

7    A    Correct.

8    Q    And there's actually discussion that the money didn't

9    arrive and possibly it was because Mr. Yerardi's ID was not put

10   on the check; is that right?

11   A    That's correct.

12   (Pause)

13   BY MR. WYSHAK:

14   Q    Okay, now, Mr. Yerardi was released from prison some time

15   last summer; is that correct?

16   A    That's correct.

17   Q    And he was placed in a halfway house?

18   A    That's correct.

19   Q    Okay.

20          THE COURT:  Whoa, whoa, whoa.  This is the first

21   time?

22          MR. WYSHAK:  Yes.

23   BY MR WYSHAK:

24   Q    In approximately August of last year?

25   A    Correct.

Direct - Russolillo

42

1   Q    And during that period of time, did you and other members

2   of the state police have occasion to conduct physical

3   surveillances of Mr. Yerardi?

4   A    Yes.

5   Q    Okay.  And during the course of those surveillances, did

6   you observe him associating with Mr. Gianelli?

7   A    Yes.

8   Q    And Mr. Daniels?

9   A    Yes.

10  Q    Okay.  He was subsequently returned to prison; is that

11  correct?

12  A    Yes.

13  Q    And he was released again in approximately February of

14  this year?

15  A    Correct.

16  Q    And again as a result of your investigation, have you

17  learned that since Mr. Yerardi's release from prison he has

18  continued to associate with Mr. Gianelli?

19  A    Yes.

20  Q    And in fact has received money from Mr. Gianelli?

21  A    Yes.

22  (Pause)

23           MR. WYSHAK:  Okay, your Honor, I think that's all I

24  have of this witness.  I just wanted to be sure that the

25  recitation of information which I think is a matter of this

1    Court's record regarding Mr. Yerardi's prior convictions and

2    his prior--

3              THE COURT:  It's all in the affidavit, right?

4              MR. WYSHAK:  It's in the affidavit.

5              THE COURT:  All right.  Mr. DiMento, you may cross

6    examine this witness, but let me just go back to a subject that

7    we talked about a minute, before this started, and that is my

8    looking at these reports.  And other than my flip remark about

9    the fact that I'm an old man and it doesn't affect me--

10             MR. DIMENTO:  Not so old, your Honor, in my eyes.

11             THE COURT:  Well, good, you're about the only one

12   here present in this courtroom that can say that.  But anyway,

13   I am concerned about that because it's not what actually I

14   would read, it's the perception or the appearance of my seeing

15   something and then making a decision.  And so, therefore, I

16   think the burden is on the government that if – first of all we

17   have heard nothing from this witness about anything that, other

18   than what has been above board and presented as an exhibit.

19   That's number one.  Number two, it's up to the government to

20   produce exculpatory evidence to you and they have that burden

21   and I'm not here as a check for that.  And, therefore, I don't

22   think I'm going to look at this stuff.  If there's exculpatory

23   stuff there, someday it's going to come out and that's a

Direct/Cross - Russolillo                                                  44

1    mistake that maybe they may have made if that's true.  So I

2    don't see any need for seeing this.  Do you agree with that?

3              MR. DIMENTO:  I certainly do, your Honor.

4              THE COURT:  Yeah.  All right.  So I'm not going to

5    look at it.  I'm giving it back to you what we've marked – hang

6    on.  One second.  One second.

7    (Pause)

8              THE COURT:  I just – before Mr. DiMento, I just want

9    to make sure we're on the record so that we're very clear about

10   this.  This, what you've marked and what I've marked for

11   identification A and B, the reports by this trooper, they do

12   not contain exculpatory information; is that correct?

13             MR. WYSHAK:  Your Honor, I did not offer them because

14   I thought they contained exculpatory--

15             THE COURT:  No.

16             MR. WYSHAK:  -- information.

17             THE COURT:  They do not.

18             MR. WYSHAK:  Right, they do not.

19             THE COURT:  Okay.  So I'm returning them.  Now,

20   Mr. DiMento you may proceed.

21             MR. DIMENTO:  Thank you, your Honor.

22                        CROSS EXAMINATION

23   BY MR. DIMENTO:

24   Q    Just a few questions.  Trooper, would you look please at

25   Exhibit 4, page three.

1    A    I don't have that in front of me, sir.

2              THE COURT:  Page 4-3?  I have it right here.  Here.

3    Lisa.

4              MR. WYSHAK:  I can give him this one.

5              MR. DIMENTO:  Take it.  No, the transcript is Exhibit

6    4, no?

7              MR. WYSHAK:  Oh, I'm sorry.

8              THE COURT:  Here give it to him.

9              THE WITNESS:  Yes, sir?

10   BY MR. DIMENTO:

11   Q    I just want to clarify something.  You said I believe--

12   A    Page four you said, sir?

13   Q    I'm sorry, page three, Exhibit 4.

14   A    Three, okay.

15   Q    Right about the middle of the page there's an exchange

16   between Gianelli and Albertelli where Gianelli said, you had

17   Sonny 24 dimes and Albertelli says, yep, and then Arthur

18   Gianelli says, which you got to take half off for him.  Is from

19   that you infer that Mr. Yerardi is being charged $12,000 for

20   the cost of the website or the internet connection?

21   A    Yes.  He's umm, he's, umm, helping paying the cost of it,

22   yes.

23   Q    And you get all of that from what I just read?

24   A    Well, if you go up the top it says adjustments for Joey

25   and they continue to talk.  That's how I make an assumption on

Cross - Russolillo                                46

1  that.

2  Q    Oh.  So we talk, we're talking about Joey, Arthur Gianelli

3  says I got to change this $14,738, okay, good--

4  A    And then he says you got to make a couple of adjustments

5  for Joey--

6  Q    -- adjustments for Joey.  Yep.

7  A    And it's my--

8  Q    Then he says you have Sonny 24 dimes.  Yep, which you got

9  to take half off for him.  For Sonny, no?

10  A    Well, it's, it's my theory that it's, it's for Joey.

11  Q    For Joey--

12  A    Correct.

13  Q    But that's your theory?

14  A    Yes.

15  Q    Okay.  The money orders that are grouped as Exhibit 7, did

16  you investigate all the money orders that went into

17  Mr. Yerardi's account at the prison?

18  A    I believe Sandra Lamansky did an investigation on that.

19  She's the one that was responsible for pulling them.

20  Q    But you can tell us, can you not, that there were money

21  orders from many sources other than Gianelli?

22  A    There are other sources from, but directed from Gianelli,

23  correct.

24  Q    From other sources not connected with Gianelli; that is

25  just say social friends of Mr. Yerardi?

Cross - Russolillo                                                          47

1   A   Umm, I can't testify to that because I don't know that.

2   Q   You don't know?

3   A   That I don't know.  I know the people that sent those were

4   directed by Mr., either Mr. Yerardi or Mr. Gianelli.

5   Q   Okay.  And you get that information from where?

6   A   The investigation.

7   Q   Of somebody else?

8   A   No, of this, of this case.

9   Q   No, I'm sorry, investigation conducted by Sandra somebody?

10  Did you say another--

11  A   Sandra Lamansky from the IRS.

12  Q   Okay.  So you can't tell us first hand if there are some

13  or many money orders deposited to Mr. Yerardi's canteen account

14  that come from sources totally unconnected with Gianelli?

15  A   I don't know of any.

16  Q   You don't know of any?

17  A   Of any, no, not during this case.

18  Q   And would you know of them if there were?

19  A   If I was, if it was, if I knew of one, I would testify to

20  it today, sir.

21  Q   I understand, but would that be something she'd report to

22  you if there were others that were unconnected with Gianelli?

23  A   She may have, correct.

24  Q   She may have?

25  A   Right.

1  Q    But you can't be sure of that?

2  A    Well, I know she, I mean she may have come across it, but

3  it was never reported to me.

4  Q    Okay.  That's what I want to know.  And then I believe

5  also you said that there were people associated with Gianelli

6  who were delivering money to Yerardi since his release from

7  prison?

8  A    That's correct.

9  Q    And who are those people?

10 A    Steve Sherman.

11 Q    Steve Sherman?

12 A    That's correct.

13 Q    Was, is a person associated with Gianelli and delivered

14 money to Yerardi?

15 A    Right, he's also associated with Mr. Yerardi.

16 Q    And where do you get that information?

17 A    From him.

18 Q    Oh, from Steve Sherman?

19 A    That's correct.

20 (Pause)

21 BY MR. DIMENTO:

22 Q    Do you have, trooper, do you have information of money

23 being sent to family members of Mr. Yerardi by persons not

24 associated with Gianelli?

25 A    Not that I know of, sir.

Cross - Russolillo                                    49

1   Q     Okay.  And if there were such information in the hands of

2   the government, that information would reside with the IRS

3   agent you just mentioned?

4   A     If so, yes.

5   Q     And you're not privy to her entire investigation?

6   A     Well, that's not true.  Yes, I am.

7   Q     You are?

8   A     It's just that I don't know of any that were sent to him

9   other than the people associated with Gianelli and Mr. Yerardi.

10  Q     Did - how about money coming from his mother or his

11  father?

12  A     There could as well be, sir.  I just don't know of it.

13  Q     Okay.  So you don't know of any money coming to him from

14  persons not associated with Gianelli but, well, strike it,

15  strike it.

16  (Pause)

17            MR. DIMENTO:  I need another moment, your Honor.

18            THE COURT:  Take a minute.  Take your time.

19  (Pause)

20            MR. DIMENTO:  All right, I have nothing further, your

21  Honor.  Thank you.

22            THE COURT:  All right.  Anything further, Mr. Wyshak,

23  with this witness?

24            MR. WYSHAK:  A few brief points, your Honor.

1          REDIRECT EXAMINATION

2    BY MR. WYSHAK:

3    Q    Getting back to the recording where the reference was made

4    to Sonny, and I think Mr. DiMento asked wouldn't it also be an

5    inference that this $12,000 was being charged to Sonny?

6    A    Yes.

7    Q    Do you remember that line of questioning?  Now, Sonny is

8    Tony Daniels; is that right?

9    A    That's correct.

10   Q    And was Tony Daniels an individual who acted as an agent

11   for this gambling business where he had customers?

12   A    Not for this gaming business, no.

13   Q    Right.  He - what was his role in connection with Gianelli

14   in Yerardi's gambling operation?

15   A    His sole purpose to be involved with Mr. Yerardi and

16   Mr. Gianelli is to start up this internet website called Duke

17   Sports.

18   Q    Right.  Would, based upon your investigation, what you've

19   learned in your investigation about the facts of this case,

20   would it make any sense that they would be charging Mr. Daniels

21   $12,000 for the service that he was providing?

22   A    Absolutely not.

23   Q    Now, on the money orders that are marked as an exhibit

24   here, the money orders were obtained as a result of finding the

25   stubs for those money orders at Mr. Albertelli's house; is that

Redirect - Russolillo                                          51

1   correct?

2   A     That's correct.

3   Q     And then you the grand jury issued a subpoena for those

4   money orders; is that correct?

5   A     That's correct.

6   Q     You haven't investigated every deposit into Mr. Yerardi's

7   canteen account, have you?

8   A     Absolutely not.

9   Q     So it's possible that in addition to the money orders that

10  are here today coming from Mr. Gianelli, there's other money

11  that went into Mr. Yerardi's canteen account?

12  A     That's a possibility, yes.

13  Q     You just don't know whether there was or not?

14  A     I just don't know, correct.

15  Q     And it's also very possible that in addition to

16  Mr. Gianelli giving Rafia money, that other people may have

17  given Rafia money?

18  A     That's correct.

19  Q     Mr. Yerardi's wife?

20  A     Correct.

21  Q     Okay.  Okay.

22        MR. WYSHAK:  Nothing further, your Honor.

23        MR. DIMENTO:  Well, let me ask you something--

24        THE COURT:  Go ahead, Mr. DiMento.

25        MR. DIMENTO:  Please.  Thank you.

Recross - Russolillo                                    52
RECROSS EXAMINATION

1
2    BY MR. DIMENTO:

3    Q    This $12,000 now intrigues me, Mr., trooper.  Does the
4    $12,000 show on Exhibit 3?

5    A    I, I, - by looking at it right here, sir, I can't, I can't
6    testify to say yes or no on that.  I don't know.

7    Q    But you did look, but you looked for it before, did you?

8    A    No, I did not.

9    Q    Well, you didn't even think to look for it there?

10   A    Not at all.

11   Q    Well, this ledger, according to you, keeps a running
12   account of everything owed as between Gianelli and Yerardi, no?

13   A    That's correct, but, sir, it also, it - let's say for
14   instance 127570, if you look at the first number--

15   Q    I'm looking at it.

16   A    -- and let's just say there was 12 there.  Not
17   necessarily, well, the bottom underneath, the number underneath
18   that subtract just 12 because there's going to be commissions
19   involved with other expenses.  So there's no way of just
20   grabbing the 12,000 and finding out that's the one right there
21   because there's other figures involved.

22   Q    Is there any other record indicating the $12,000 anywhere?

23   A    Not that I know of, sir.

24   Q    Do we know if Sonny Daniels is a straw for other people
25   even though he may not own the business himself?

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

Recross - Russolillo                                                    53

1    A    Sonny Daniels does not own the business.

2    Q    Even though he doesn't may - do we know whether he straws

3    for somebody else?

4    A    What do you mean by straws?

5    A    That he holds an interest in that business for other

6    people who prefer to remain silent?

7    A    I believe he does not.

8    Q    You believe he does not--

9    A    Right.

10   Q    -- on what basis do you say that?

11   A    From learning through this investigation.

12   Q    Oh, okay.  But you can't swear to that, can you, and tell

13   us that Sonny doesn't hold that interest for someone else?

14   A    I cannot swear to that, no.

15           MR. DIMENTO:  Okay, I have nothing else.  Thank you,

16   your Honor.

17           THE COURT:  All right.

18           MR. WYSHAK:  Thank you.

19           THE COURT:  You may step down, trooper.  Thank you

20   very much.

21           THE WITNESS:  Thank you.

22           THE COURT:  Leave whatever is marked up there, leave

23   it up there.  Take the rest of it.

24      (Witness excused)

25           THE COURT:  Does the government have any other

Argument                                    54

1   witness?

2            MR. WYSHAK:  No, your Honor, the government rests.

3            THE COURT:  All right.  Mr. DiMento any witnesses?

4            MR. DIMENTO:  No, your Honor.  Thank you.

5            THE COURT:  All right.  Let me hear from the

6   government.

7            MR. WYSHAK:  Well, your Honor, I would describe

8   Mr. Yerardi as totally incorrigible.  He obviously ran a large

9   scale gaming, loan sharking organization in the late `80's into

10  the mid `90's connected to members of organized crime.  When

11  indictments were imminent, he ran away, was caught in Florida.

12  I mean, you know this whole story so I won't repeat it in great

13  detail - did everything to evade capture.  He was finally

14  captured.  He was dragged back to this court.  He was released.

15  Even after he was released on a bracelet, he continued,

16  continued to engage in criminal activity, continuing to try to

17  run his illegal business, continuing to collect money owed to

18  the illegal business until again he was dragged back in here

19  and detained.

20            The Court found him in contempt.  He ultimately was

21  convicted of an indictment that pretty much looks like the

22  indictment of today; same kinds of offenses, same magnitude of

23  criminal activity, and he served a decade in prison as a result

24  of that conviction.  Now, one would think after all that

25  Mr. Yerardi would have learned his lesson.  But what we have

Argument                                55

1   uncovered in this investigation is in fact that Mr. Yerardi

2   didn't skip a beat, that he continued to run his criminal

3   business through his partner, Arthur Gianelli, while he was

4   incarcerated.  Not only did he continue to operate the business

5   but he had the proceeds of that business funneled to him in

6   prison, funneled to his family members, his wife, his children.

7   In fact, his children went to schools that the average person

8   out there could not afford.  I mean, the average person cannot

9   send their children to Belmont Hill School.  It's a very

10  expensive private school.  In fact, while Mr. Yerardi was

11  incarcerated his family lived in the lap of luxury based upon

12  the proceeds of his ongoing continuing criminal activity while

13  he's locked up in a federal institution.

14          When he is released to a halfway house last summer,

15  he picks up where he left off and is immediately put back in

16  prison to serve out the remainder of his sentence.  When he got

17  out of jail in February, he's again, same thing, out beating

18  the bushes and as the witness testified, this individual, Steve

19  Sherman, who is an intermediary between Mr. Gianelli and

20  Mr. Yerardi, continued to deliver money to Mr. Yerardi from

21  Mr. Gianelli right up until a few weeks ago or a few weeks

22  prior to Mr. Yerardi's arrest.

23          There are no conditions of release that this Court

24  can impose that's going to guarantee, that's going to stop him.

25  You're not going to stop him.  I mean, I don't even know if

1   he's detained if you're going to stop him.  But you're

2   certainly not going to stop him if he is released.  It's, you

3   know, I mean, I guess they say it's tough to teach an old dog

4   new tricks and, you know, Mr. Yerardi is not going to change.

5   He's not going to change his spots now.

6            I would also note that I think probation because he

7   was on supervised release for at least two months before his

8   arrest, I think that probation should have an opportunity to

9   revoke his supervised release.  So I think, you know, as we did

10  have in the case of Mr. Icaboni, that Mr. Yerardi should be

11  temporarily detained at least until probation has an

12  opportunity to determine whether or not they want to revoke his

13  supervised release.  Of course that may be academic depending

14  upon what this Court does.

15           THE COURT:  Who's the Judge that has the release?

16           MR. WYSHAK:  It was Judge Keeton's case.

17           THE COURT:  Okay, so he has that.  Judge Gorton has

18  this case?

19           MR. WYSHAK:  Has the new case, yes, your Honor.

20           THE COURT:  All right.

21           MR. WYSHAK:  Now, I also think that the presumption

22  under 3142(e) applies in this case, and I say that because I

23  believe that the prior crimes of violence that Mr. Yerardi was

24  convicted of back in 1995, to some extent part of them were

25  committed while he was on release from this court and,

1   therefore, he committed a crime of violence while on release

2   and in a period of not more than five years has elapsed since

3   the date of that conviction or the release of the person from

4   imprisonment.  I mean, in fact it's only two months that has

5   elapsed since his release from imprisonment.  So I think that

6   under 3142(e), that presumption applies and that the defendant

7   in this case has the burden of rebutting that presumption.

8           I also, you know, and this again is recited to some

9   extent in Trooper Russolillo's affidavit, think that

10  Mr. Yerardi is a threat to again do what he tried to do before

11  which was intimidate witnesses, obstruct justice.  He was

12  convicted of those offenses.  There is some references to the

13  PSR and some notations from the PSR which reflect his

14  obstruction of justice that we've included in Trooper

15  Russolillo's affidavit.

16          I also think that Mr. Yerardi at this point is a

17  serious flight risk.  I say that for several reasons.  He's got

18  no roots here.  I mean, he's been in jail for 10 or 11 years.

19  I don't think his wife, Rafia Feghi, will let him move back

20  into the house with her.  He doesn't have a job.  When he fled

21  before, he left his family, which was an intact family unit.

22  He left his parents.  He left everything he had up here.  Now,

23  he has even less of an incentive to stick around.  So I do

24  think that based upon his prior history and his current

25  situation, he has, he is as serious a flight risk as he was

Argument                                          58

1    before.

2           Finally, your Honor, I mean, you've seen just a

3    small, had a small taste of what the evidence is in this case.

4    It's a very strong case.  The government has numerous witnesses

5    who have testified who will implicate Mr. Yerardi in this

6    criminal organization, who participated in all the transactions

7    concerning the money orders and all the other payments for

8    Mr. Yerardi's expenses and his family's expenses.  The

9    likelihood of conviction is strong.  I think we recited in

10   Trooper Russolillo's affidavit that I think Mr. Yerardi is

11   looking at another nine or 10-year sentence if he's convicted

12   on this case.

13          Furthermore, I think on – this is a classic case

14   calling for an upward departure in the criminal history

15   category.  Last time Mr. Yerardi was sentenced, he was a

16   category three.  Gets convicted on this case, he's going to be

17   at least four.  But if you look at Mr. Yerardi's criminal

18   record that we've attached to this, I mean, Mr. Yerardi has

19   been a criminal from the day he was 18 – I don't know if he had

20   a juvenile record – up until the present day.  He's never been

21   anything but a criminal.  If there was ever a classic case for

22   an upward departure in the criminal history category, this is

23   it.  He's facing an extensive jail term, and I think that he

24   should be detained.

25          THE COURT:  Okay.  Thank you.  Mr. DiMento?

1    MR. DIMENTO:  Your Honor, please, on the question of

2    flight, I think it's fair to say that never has Mr. Yerardi

3    failed to appear in court once he's made that first appearance

4    and once he's sworn to abide by the requirements of the court.

5    So that the flight risk is really, is really not real here.

6            THE COURT:  Well, what about when he took off before?

7            MR. DIMENTO:  That – he was in Florida when the

8    indictment was returned.

9            THE COURT:  Oh, okay.

10           MR. DIMENTO:  He had already been there for five

11   months when the indictment was returned.  So we're attributing

12   to him a perspicacity that I don't think the ordinary person

13   would have; that is, that he could see five months ahead of

14   time that there would be an indictment.  That's where he was at

15   the time.  Once he appeared here, he was, he was faithful to

16   all his obligations.  So, and furthermore, that was 10 years

17   ago.  Today, 10 years later, his parents are 10 years older.

18   They're both 88.  His mother is present in the courtroom today.

19   His father has just been diagnosed with cancer and is about to

20   begin chemotherapy treatments.  And he has a daughter by the

21   name of Alyssa who is about 21 years old, a son, Joseph Jr.,

22   who is 17 years old, a wife in a marriage that is intact, and a

23   former wife, who still is on good terms with him, and he has

24   lived in the Boston area his entire life.  So that he has the

25   necessary ties with the community, and I just can't believe

1  that anyone could seriously argue that he's a flight risk.

2         On the question of the merits of the case, if this is

3  the - you can see from the case itself that we've got some

4  leaps of faith here.  The trooper has to make some inferences

5  that are not all that clear and certainly don't stand up to

6  reach the standard of clear and convincing evidence.  I mean,

7  how he gets Yerardi to be the half owner of an internet

8  business on four lines from the transcript defies my ability to

9  reason, I tell you.  But, you know, when we're talking about

10 this internet business, half the population if not more thinks

11 internet gambling is legal.  It's advertised extensively in

12 newspapers.  You can use your American Express card or any

13 credit card you have to pay for bets over the internet.

14 American Express does business with, and all Visa and the rest

15 of them, all do business with these internet gambling ventures,

16 so that there's, it's no surprise that Mr. Yerardi and

17 Mr. Gianelli would be talking about internet gambling on the

18 telephone.  But it takes a little more to prove that

19 Mr. Yerardi is more than the recipient of largess from

20 Mr. Gianelli at a time when Yerardi needed help for his family

21 and for his own personal purposes when he was in prison.  But

22 to make him a partner with Gianelli, is a little more than I

23 think you've seen in the evidence here.

24        Now, I know that he has been here before you on a

25 prior occasion.  I think I was in the courtroom.  I may have -

Argument                                                    61

1   I think I represented his wife at the time?

2          THE COURT:  You did.

3          MR. DIMENTO:  Well, you have a better memory than —

4   yes, and I was trying to think, did I represent his wife or him

5   but it was his wife.

6          THE COURT:  Wife.

7          MR. DIMENTO:  And, but it involved Yerardi, of

8   course.  But things have changed since that time.  At the time

9   he had no source of income, he was stuck in his apartment with

10  his wife, and admittedly, as you've heard, was trying to get

11  some money to live on.  First thing he did when he got into the

12  halfway house last August is to get a job and an honest job.

13  He was, he had a draw of $500 a week against which he was

14  working and was doing well and is doing right up to the time of

15  his most recent arrest.  So he is working and he is able to

16  earn an honest living, which was not the case when he was

17  before you the last time.

18         Just a moment, your Honor, just trying to make sure

19  that I haven't missed anything that Mr. Wyshak has raised.  I

20  don't think so.

21         THE COURT:  All right.

22         MR. DIMENTO:  Excuse me, I do, I have made reference

23  to Mrs. Yerardi.  She's here with the deed to her home.  She

24  has a home that's worth $600,000 without a mortgage.  After a

25  lifetime of work, they've paid down their mortgage, and she's

Argument                                                          62

1   ready to put up her house, her home.  I don't think that Mr.

2   Yerardi is now, after all that has passed, is now going to

3   jeopardize his mother's home when, at a time when his father is

4   so gravely ill.  So that I would suggest that a bond secured by

5   Mrs. Yerardi would be sufficient and the direction that

6   Mr. Yerardi continue to work and to just keep his distance from

7   Mr. Gianelli, which he has done faithfully since the last

8   order.

9           Thank you.

10           THE COURT:  All right.

11           MR. WYSHAK:  May I respond just briefly?

12           THE COURT:  No, you don't - I need to look at

13   everything that's been submitted, and so I'm going to take the

14   matter under advisement.  If I feel there's a need for a

15   further hearing, of course, I'll advise the parties, but at the

16   moment, I'm taking the matter under advisement.  Court's in

17   recess.

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1    //

2    //

63

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

Maryann V. Young

June 12, 2005